[Crim. No. 5692.   In Bank.   Oct. 7, 1955.]

THE PEOPLE, Respondent, v. BRUCE ALEXANDER MacEWING et al., Appellants.

220

Joseph A. Ball and A. H. McConnell for Appellants.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

GIBSON, C. J.—After a trial by jury defendants were convicted of abortion and conspiracy to commit abortion. They appeal from the judgments and from orders denying their motions for a new trial, contending that erroneous instructions were given with respect to the necessity for corroboration of the testimony of the woman on whom the asserted abortion was performed and that certain hearsay evidence was erroneously admitted.

Mrs. Frawley, the woman who assertedly submitted to an abortion, testified that in April 1953 she and defendant Hewett participated in acts of sexual intercourse, and subsequently she consulted a Dr. Johnson and was informed that she was pregnant. She talked to Hewett about her condition

and asked if there was any way he could help her. Hewett told her that Dr. MacEwing (a licensed physician and surgeon) had performed an abortion on his sister and that he would call and make arrangements with him. On the next day Hewett told Mrs. Frawley that he had talked with the doctor, and he gave her a paper containing MacEwing's name, address and telephone number. On August 17 Mrs. Frawley went to MacEwing's office, and he asked who had referred her to him. She said that Hewett had and added that she thought that Hewett had talked to him about her. MacEwing examined her, after which he left the room. Mrs. Walling, a nurse, entered and stated that usually "they put a packing in you and then let you go home to miscarriage," and that the price would be $400 in cash. Mrs. Frawley returned to MacEwing's office on August 20 and paid Mrs. Walling $400 in small bills but was given no receipt. Mrs. Frawley was directed to undress and was given certain injections. MacEwing told her that she was "too far gone," that no surgery could be performed and that they would have to "do it the hard way." He then left, a blindfold was placed over her eyes, and someone entered the room. She felt an instrument inserted in her body and a burning pain, and then felt something pushed into her. She heard someone leave the room, and, subsequently, the blindfold was removed. The next day Mrs. Frawley talked to MacEwing on the telephone, and he asked her if she had miscarried. Upon her negative reply he told her not to get alarmed and that he would see her Monday. On Monday, August 24, she went to his office and was given several hypodermic injections by MacEwing and by a Miss Perry who stated that this was done to bring on cramps. Late that evening she had a miscarriage. On August 30 she called Dr. Johnson, who sent her to a hospital where she remained for several days. Mrs. Frawley described in detail the offices occupied by MacEwing. which were apparently shared by another doctor, and the jury was subsequently taken to view the premises.

Dr. Johnson testified that on June 26 he informed Mrs. Frawley that she was pregnant. He saw her on the evening of August 24, at which time she was in pain, and the next day she came to his office and gave a history of having been aborted. On August 31 she had a fever and an infection which he believed was the result of an abortion. He made arrangements for her to be sent to the hospital, and he did not find anything that would indicate that an abortion was

necessary to save her life. Mrs. Frawley's mother testified that on the evening of August 24 her daughter was very ill and had a miscarriage.

A cab driver testified that on August 24 he received an order to go to MacEwing's office and pick up a passenger; that Mrs. Frawley came out of that office looking very pale, disheveled and nervous; and that he took her to an address she gave him.

On October 1, after the preliminary hearing, a man subsequently identified as MacEwing was observed distributing handbills at the factory where Mrs. Frawley worked. When asked for identification by the plant's security officer, MacEwing said his name was George Case, that he worked for Rheems Manufacturing Company and that he had been to a union meeting. The handbills read: "Union Civic & Moral Committee. Union Workers. This is where your funds go!! Gertrud Frawley . . . Admitted Abortion!! She figures to apply for insurance to pay. We Protest! Signed— Painters dept. 559. Long Beach Douglas Plant. Swing Shipt." The handbills were not authorized by the union which represented the workers in the painting department.

At the time defendant Hewett was arrested he admitted knowing Mrs. Frawley, and, when asked if he had made any arrangement for her regarding an abortion, he replied that she had talked to him and that he had called MacEwing's office but was never able to contact either MacEwing, whom he called Bruce, or Mrs. Walling, whom he called "Wally." He said that he talked on the telephone to a woman in the office and that he told her "what he wanted, that he was trying to get some help for a girl that was pregnant," but that he was told that "it couldn't be done." He said he had known MacEwing for several years and had helped his brother, Ben Hewett, paint the doctor's office.

Neither of the defendants testified.

At the request of the prosecution the jury was given an instruction containing the statement, "The test of the corroboration of an abortee is whether the evidence other than such testimony of Mrs. Frawley by reasonable inference, connects the defendant with the crime *or* whether it satisfies the jury that the woman is telling the truth."[1]  (Italics

---

[1]The entire instruction reads: "The corroboration required of the testimony of a woman who claims to have been aborted need not, by itself, establish that the crime was committed or show all the elements thereof but it must relate to some act or fact which is an element of

added.) The alternative form of the instruction obviously permitted the jurors to treat the corroborative evidence as sufficient, even though it did not connect defendants with the offenses charged, if they were satisfied that the woman was telling the truth. The question is whether such an instruction is authorized by section 1108, which provides that the defendant in a prosecution for procuring an abortion cannot be convicted upon the testimony of the woman upon whom the offense was committed ''unless she is corroborated by other evidence.''[2] This provision also applies to the crime of conspiracy to commit an abortion. (*People* v. *Buffum*, 40 Cal.2d 709, 723-724 [256 P.2d 317].)

A number of decisions involving section 1108, without discussing the problem, have applied the test specified in section 1111 of the Penal Code that the corroboration of the testimony of an *accomplice* must ''tend to connect the defendant with the commission of the offense.''[3] (See, for example, *People* v. *Gallardo,* 41 Cal.2d 57, 62-63 [257 P.2d 29] ; *People* v. *Miner,* 96 Cal.App.2d 43, 49-50 [214 P.2d 557] ; *People* v. *Malone,* 82 Cal.App.2d 54, 61 [185 P.2d 870] ; *People* v. *Lorraine,* 28 Cal.App.2d 50, 53 [81 P.2d 1004] ; *People* v. *Lee,* 81 Cal.App. 49, 53 [252 P. 763] ; *cf. People* v. *Wilson,* 25 Cal.2d 341, 346-347 [153 P.2d 720] [assuming that the

---

the offense. Such evidence must create more than a suspicion but it may be sufficient, even though slight, and entitled to but little consideration when standing by itself, to furnish the legal corroboration required. The test of the corroboration of an abortee is whether the evidence other than such testimony of Mrs. Frawley by reasonable inference, connects the defendant with the crime or whether it satisfies the jury that the woman is telling the truth. The necessary corroboration may consist of inferences from the circumstances surrounding the transaction, from the acts and declarations of the defendant during or after the alleged occurrence, from evidence showing a consciousness of guilt or other evidence of like character which satisfies the jury of the truth of the charge.''

[2]Section 1108 of the Penal Code reads: ''Upon a trial for procuring or attempting to procure an abortion, or aiding or assisting therein, or for inveigling, enticing, or taking away an unmarried female of previous chaste character under the age of eighteen years, for the purpose of prostitution, or aiding or assisting therein, the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence.''

[3]Section 1111 of the Penal Code reads: ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.''

requirements of section 1111 might apply under section 1108].) Moreover, sections 653f [solicitation of certain crimes] and 1103a [perjury] of the Penal Code, like section 1108, require corroboration but do not specify what type of evidence is necessary, and both of these provisions have been construed to mean that the corroborating evidence must tend to connect the defendant with the offense. (See *People* v. *Wayne,* 41 Cal.2d 814, 828 [264 P.2d 547] ; *People* v. *Follette,* 74 Cal.App. 178, 204 [240 P. 502] ; *People* v. *Woodcock,* 52 Cal.App. 412, 418 [199 P. 565].) The use of different tests for application of the several statutes relating to corroboration would be very confusing, and a distinction is not justified merely because in some instances the Legislature has not explained what is meant by words such as "corroborated" or "corroborating." Accordingly, the tests developed by the courts for determining the sufficiency of corroborative evidence under section 1111 are equally applicable to section 1108.

The most recent decisions have in substance phrased the rule as follows: The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth. (*People* v. *Simpson,* 43 Cal.2d 553, 563-564 [275 P.2d 31] [§ 1111] ; *People* v. *Santo,* 43 Cal.2d 319, 327 [273 P.2d 249] [§ 1111] ; *People* v. *Gallardo,* 41 Cal.2d 57, 62 [257 P.2d 29] [§ 1108] ; *People* v. *Barclay,* 40 Cal.2d 146, 156 [252 P.2d 321] [§ 1111] ; *People* v. *Berger,* 128 Cal.App.2d 509, 513 [275 P.2d 799] [§ 1108] ; *People* v. *Reed,* 128 Cal. App.2d 499, 501 [275 P.2d 633] [§ 1108] ; *People* v. *Griffin,* 98 Cal.App.2d 1, 23-28 [219 P.2d 519] [§ 1111].) The case of *People* v. *Califro,* 120 Cal.App.2d 504, 513 [261 P.2d 332], is inconsistent with the other decisions on the matter insofar as it declares that the test of corroboration of an accomplice is whether the evidence connects the defendant with the crime "or" whether it satisfies the jury that the accomplice is telling the truth. Moreover, *People* v *Griffin,* *supra,* 98 Cal.App.2d 1, 28, relied on by the Califro case, does not support the alternative form of the rule. The statement in the Califro case, therefore, must be disapproved.

In view of the principles discussed above the instruction given by the trial court was clearly erroneous. The effect of the error was undoubtedly intensified by the fact that the district attorney in his argument made the same erroneous

statement of the law and then told the jurors that the court would so inform them and that they should listen for similar language in the court's instructions.

Defendants also assign as error the trial court's action in adding a sentence to an instruction given at their request. The court instructed, first, ''The legal test you must apply in determining whether the testimony of Frawley was corroborated is to eliminate the testimony of Frawley and examine the other evidence to determine if such other evidence, standing alone and without support from the testimony of Frawley, fairly, logically, directly and immediately tends to connect the defendant with the commission of the alleged crimes.'' The court then added: ''The corroborating evidence may take interpretation and direction from the testimony of Frawley to give it meaning and value.''

█ The decisions applying section 1111, relating to accomplices, hold that the corroborative evidence required by that provision must be considered without the aid of the testimony which is to be corroborated and that it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. (*People* v. *Hoyt*, 20 Cal.2d 306, 312 [125 P.2d 29]; *People* v. *Shaw*, 17 Cal.2d 778, 805-806 [112 P.2d 241]; *People* v. *Rankin*, 10 Cal.2d 198, 201 [74 P.2d 71]; *People* v. *Davis*, 210 Cal. 540, 554-559 [293 P. 32]; *People* v. *Reingold*, 87 Cal.App.2d 382, 393. 408 [197 P.2d 175]; *People* v. *Garrison*, 80 Cal.App.2d 458, 461 [181 P.2d 738], *People* v. *Sawaya*, 46 Cal.App.2d 466, 469 et seq. [115 P.2d 1001].) There are two opinions which, although not clear, indicate that a similar rule applies with respect to section 1108. (See *People* v. *Crain*, 102 Cal.App. 2d 566, 579 [228 P.2d 307]; *People* v. *Murphy*, 60 Cal.App:2d 762, 772 [141 P.2d 755].) █ In our opinion both statutes must be construed to mean that corroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged. The instruction was therefore erroneous.

█ The prosecution argues that the instruction as changed by the trial court can be justified upon the theory that the judge, having first instructed the jury to eliminate Mrs. Frawley's testimony in determining if there was other evidence tending to connect defendants with the crime, could

properly tell the jury that if such corroborative evidence was found then in that event it might take interpretation and direction from the abortee's testimony. The sentence added by the court, however, is a direct, unqualified statement that the testimony of Mrs. Frawley could be used to interpret the corroborative evidence, and it would not convey to a jury the limited meaning urged by the prosecution.

The next question relates to the admissibility of certain testimony given at the preliminary hearing by Miss Perry, an employee of MacEwing. This witness was not present at the trial, and it was stipulated that she could not be found after diligent search. A portion of her testimony was clearly admissible under section 686 of the Penal Code, which authorizes the use at trial of testimony produced at the preliminary hearing when the witness is no longer available. Defendants, however, contend that it was error for the trial court, over repeated objections, to permit the district attorney to read other parts of her testimony in substance as follows: The witness was asked a number of questions concerning Mrs. Frawley, such as whether she had been in the office, whether she was in pain, and whether she had been given hypodermic injections. The witness replied that she did not remember. The prosecuting attorney then showed her a written statement, and she admitted that it was in her handwriting and that she had delivered it to the police officers. Portions of the statement incriminating to MacEwing and the witness were then read, and the witness, when asked, replied in each instance that they were in her handwriting but that she could not remember having written them or any of the events referred to in them. The memory of the witness was not refreshed as to any part of the written statement, and she did not attest to its truthfulness or otherwise authenticate it except by admitting that it was in her handwriting. To the contrary, when asked what she was trying to say when she wrote it, she replied: "All I wanted to do was to go home. . . . I just wanted to get out of there. . . . I guess I thought if I said what they wanted me to they would let me go." She added that someone in the room told her what to write down. The written statement itself was not offered in evidence either at the preliminary hearing or at the trial, and it was not sufficiently authenticated to be admissible. (See 3 Wigmore on Evidence [3d ed., 1940], §§ 734 et seq., 747 et seq., 754.)

The prosecution may, of course, question its own

witness with respect to his prior statements to refresh his memory and, in case of surprise, to impeach him. (See *People v. LeBeau*, 39 Cal.2d 146, 148-149 [245 P.2d 302]; *People v. Durrant*, 116 Cal. 179, 213, 214 [48 P. 75]; *People v. Zammora*, 66 Cal.App.2d 166, 216-217 [152 P.2d 180]; *People v. Curtis*, 36 Cal.App.2d 306, 322-323 [98 P.2d 228].) ▮ Accordingly, it was proper at the preliminary hearing to ask Miss Perry whether she remembered the matters in her handwritten statement. At the time of trial, however, there was no justification for the admission of the portions of the transcript relating to the statement because the witness was not then available to have her memory refreshed and the element of surprise no longer existed. The introduction of such portions of the transcript was highly improper because, as a result, the jury was informed of incriminating, but inadmissible, matters.

After consideration of the entire record we are of the view that the errors noted above have resulted in a miscarriage of justice.

The judgments and the orders denying defendants' motions for a new trial are reversed.

Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.